**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

C.P., individually and on
behalf of F.P., a minor
child; D.O. individually
and on behalf of M.O., a
minor child; S.B.C.,
individually and on behalf of
C.C., a minor child; A.S.,
individually and on behalf of
A.A.S., a minor child; M.S.,
individually and on behalf of
her minor child, H.S.;
Y.H.S., individually
and on behalf of his minor
child, C.H.S.; E.M. on behalf
of her minor child, C.M.;
M.M., individually and on
behalf of K.M.; L.G.,
individually and on behalf of
her minor child, T.M.;
E.P., individually and on
behalf of her minor child,
Ea.P.; and on behalf of
ALL OTHERS SIMILARLY
SITUATED,

        Plaintiffs,

    V.

NEW JERSEY DEPARTMENT OF
EDUCATION and ANGELICA ALLEN-
McMILLAN, Acting Commissioner
of Education, in her official
capacity,

        Defendants.

---

Civil Action No. 19-12807

**OPINION**

CATHERINE MERINO REISMAN
REISMAN CAROLLA GRAN & ZUBA LLP
19 CHESTNUT STREET
HADDONFIELD, NJ 08033-1810

ROBERT CRAIG THURSTON
THURSTON LAW OFFICES LLC
100 SPRINGDALE ROAD A3
PMB 287
CHERRY HILL, NJ 08003

DONALD A. SOUTAR
KRISTA LYNN HALEY
SARAN QIANA EDWARDS
JOHN RUE AND ASSOCIATES
37 MAIN STREET
SPARTA, NJ 07871

JEFFREY IAN WASSERMAN
WASSERMAN LEGAL LLC
30B VREELAND ROAD
SUITE 120
FLORHAM PARK, NJ 07932

JOHN DOUGLAS RUE
LISA MARIE QUARTAROLO
JOHN RUE & ASSOCIATES
694 ROUTE 15 SOUTH
SUITE 206
LAKE HOPATCONG, NJ 07849

THOMAS JOSEPH O'LEARY
DAVID DANA CRAMER
HECTOR DANIEL RUIZ
WALSH PIZZI O'REILLY FALANGA LLP
THREE GATEWAY CENTER
100 MULBERRY STREET
15TH FLOOR
NEWARK, NJ 07102

DAVID R. GILES
34 RYNDA ROAD
SOUTH ORANGE, NJ 07079

DENISE LANCHANTIN DWYER
LAW OFFICE OF DENISE LANCHANTIN DWYER LLC
5 DUXBURY CT
PRINCETON JUNCTION, NJ 08550-2137

    *Counsel for Plaintiffs.*

ERIN IRENE HERLIHY
COLIN KLIKA
CAROLYN G. LABIN
DAVID LEE KALISKY
STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET
P.O. BOX 112
TRENTON, NJ 08625

    *Counsel for Defendants.*

LAURIE LEE FICHERA
STATE OF NEW JERSEY, DIVISION OF LAW
HUGHES JUSTIC COMPLEX
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

    *Counsel for OAL*

JENNIFER N. ROSEN VALVERDE
EDUCATION LAW CENTER
RUTGERS UNIVERSITY SCHOOL OF LAW
123 WASHINGTON STREET
NEWARK, NJ 07102

    *Counsel for Amici Curiae SPAN Parent Advocacy Network;*
    *Advocates for Children of New Jersey; Council of Parent*
    *Attorneys and Advocates; Disability Rights New Jersey;*
    *Educational Law Center; NJ Special Education Practitioners;*
    *Volunteer Lawyers for Justice; Esther Canty-Barnes, Esq.;*
    *and Jennifer N. Rosen Valverde, Esq.*

**HILLMAN**, District Judge

Before the Court are Plaintiffs'[1] and Defendants'[2] dueling

---

[1] This class action involves ten sets of named plaintiffs, all identified by their initials only.  To facilitate accuracy and clarity in identifying these various plaintiffs, each will be referred to in this Opinion according to the following definitions:

- C.P., individually and on behalf of F.P., a minor child, will hereafter be identified as "C.P.";

- D.O., individually and on behalf of M.O., a minor child, will hereafter be identified as "D.O.";

- S.B.C., individually and on behalf of C.C., a minor child, will hereafter be identified as "S.B.C.";

- A.S., individually and on behalf of A.A.S., a minor child, will hereafter be identified as "A.S.";

- M.S., individually and on behalf of her minor child, H.S., will hereafter be identified as "M.S.";

- Y.H.S., individually and on behalf of his minor child, C.H.S., will hereafter be identified as "Y.H.S.";

- E.M. on behalf of her minor child, C.M., will be identified as "E.M.";

- M.M., individually and on behalf of K.M., will hereafter be identified as "M.M.";

- L.G., on behalf of her minor child T.M., will hereafter be identified as "L.G."; and

- E.P., individually and on behalf of her minor child, Ea.P, will hereafter be identified as "E.P."; and

- Where all plaintiffs are being referenced collectively, the Court uses the term "Plaintiffs."

[2] "Defendants" refers collectively to the New Jersey Department

motions for summary judgment on the claims set forth in the Second Amended Complaint (ECF 78). Ultimately, this case boils down to what Plaintiffs allege is Defendants' knowing, blatant, entrenched, and institutionalized disregard for their responsibility to provide timely resolution of due process petitions for students who are entitled to special education from New Jersey's school systems.  Defendants make every effort to find technicalities as to why the Court cannot give to Plaintiffs the relief that they so desperately need, despite Defendants' having acknowledged, at least at times, that they have fallen fall short under federal law.[3]

It is a fundamental truth that the federal courts have

---

of Education ("NJDOE") and the Commissioner of Education (the "Commissioner").

[3] Plaintiffs filed a motion for sanctions against Defendants for arguing that they have not violated the 45-day rule despite having previously admitted to the Court that they are not in compliance.  (ECF 301).  While the Court expresses its concerns regarding the lack of consistency in Defendants' positions, the Court is not unmindful of its obligations as a court of equity to assess all of the relevant and countervailing circumstances. The administrative process that the state of New Jersey has created to fulfil its obligations under federal education law in a state where home rule and local school boards govern, albeit funded in part with federal dollar and of its own design, is a big and complicated ship.  It does not pivot on a dime.  The government rarely does, if ever.  It may ultimately be a losing one, especially in the face of the inevitable admissions that have been made and may have to be made, but the Defendants' position that the problems found in the system are more nuanced and complicated than might first appear at first glance is not a sanctionable position.

broad equitable powers to grant relief to remedy injustice.
Tillery v. Owens, 907 F.2d 418, 429 (3d Cir. 1990) ("'[T]he
scope of a district court's equitable powers to remedy past
wrongs is broad, for breadth and flexibility are inherent
in equitable remedies.'") (quoting Swann v. Charlotte-
Mecklenburg Board of Education, 402 U.S. 1, 15 (1971)).  The
Court keeps this in mind, as it noted previously, as this case
involves both some of the most vulnerable in our society and how
they are treated by their government.  (See ECF 98).

However, because the remedies sought by the Plaintiffs
will, if granted, entail significant institutional reforms,
there appear to be genuine issues of material fact, and as this
Court as ultimately factfinder may benefit from the fullest
possible record tested by cross-examination and the full
adversarial process, both motions will be denied.

## RELEVANT PROCEDURAL HISTORY

On May 22, 2019, Plaintiffs filed an initial complaint in
this matter.  (ECF 1).  Shortly thereafter, on August 26, 2019,
Plaintiffs filed a first amended complaint.  (ECF 21).  On
October 15, 2019, Defendants moved to dismiss the first amended
complaint.  (ECF 28).  On October 25, 2019, Plaintiffs moved for
class certification (ECF 30) and simultaneously moved for the
first of two preliminary injunctions (ECF 31).  On January 29,
2020, Plaintiffs moved for a second preliminary injunction on

separate grounds.  (ECF 69).  The parties fully briefed each of these motions, and on February 18, 2020, the Court entertained oral argument on them.  That hearing was continued on March 2, 2020.  During oral argument on February 18, 2020, for reasons expressed on the record, the Court invited Plaintiffs to file a second amended complaint to more fully explain certain factual allegations; Plaintiffs did so on February 27, 2020 (ECF 78) (the "Second Amended Complaint").[4]

On March 26, 2020, Defendants moved to dismiss Plaintiffs' Second Amended Complaint.  (ECF 90).  On April 9, 2020, Plaintiffs opposed Defendants' Motion.  (ECF 95).  The Court granted in part and denied in part that motion on May 22, 2020 (ECF 98).  Thereafter, on November 24, 2020, the Court consolidated Plaintiffs' motion for a preliminary injunction with an expedited trial on the merits.  (ECF 140).  The Court also denied Plaintiffs' motion for class certification without prejudice in lieu of more discovery.  (Id.)

After a contentious discovery period, discovery closed in November 2021.[5]  In addition, on November 22, 2021, Plaintiffs again moved for class certification, this time seeking

---

[4] Plaintiffs first filed their Second Amended Complaint on February 26, 2020 (ECF 76).  A corrected version was filed the next day.  (ECF 78).

[5] The Court allowed a period of further discovery in March 2022 which concluded in May 2022.  (See ECF 343, 350, 370).

certification of a Rule 23(b)(2) and a Rule 23(b)(3) class.
(ECF 240, 241).  The Court granted those motions on August 19,
2022.  (ECF 384, 385).

On November 22, 2021, both Plaintiffs and Defendants
submitted competing motions for summary judgment on the Counts
in the Second Amended Complaint. (ECF 243, 247).  The parties
also submitted opposition and reply briefing in accordance with
their respective positions.  With those motions, the parties
collectively submitted thousands of pages of exhibits, which the
Court has parsed in order to come to its decision today.

**BACKGROUND**

I.   <u>The IDEA</u>

Congress enacted the IDEA to, among other things, ensure
"the rights of children with disabilities and parents of such
children are protected[.]"  20 U.S.C. § 1400(d)(1)(A)-(B).  The
IDEA requires that every child with a disability receive a free
appropriate public education (a "FAPE") from their public school
if that school receives federal funding under the IDEA.  20
U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a).  The term "free
appropriate public education" means the provision of "special
education and related services" that meet certain criteria.  20
U.S.C. § 1401(9).  The IDEA also guarantees parents of disabled
children a right to participate in the educational programming
offered to their children.

To ensure that public schools adequately provide a FAPE and that the rights of disabled students and their parents are not infringed, Congress enacted various "procedural safeguards" that participating public schools must comply with.  20 U.S.C. § 1412(6)(A); 20 U.S.C. § 1415(a).  One such procedural safeguard provides standards for adjudicating disputes about whether a school has adequately provided a FAPE.  Per Congress' requirements, these disputes begin with the filing of a "due process petition" or "due process complaint."  Either the public school or the child may file a due process complaint, and that complaint may seek relief with respect to "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6).  Once a due process complaint has been filed, Congress has set strict deadlines by which certain events must occur.  See 20 U.S.C. § 1415(f)(1)(B)(ii) (referencing timelines "applicable [to] a due process hearing"); 34 C.F.R. § 300.515(a) (setting forth a strict timeframe for due process petition resolution); N.J.A.C. 6A:14-2.7(j) (same).  Those deadlines are at the heart of this action.

Beginning with the date the due process complaint is filed, the parties have thirty days within which to settle or otherwise resolve the dispute to the satisfaction of the parent and child.

See 20 U.S.C. § 1415(f)(1)(B); 34 C.F.R. § 300.510(b).  This
period is referred to as the "resolution period."  If the case
is not resolved during the resolution period, it may proceed to
a hearing.  Congress has called these "due process hearings."
Although there are apparently alternative methods utilized
elsewhere to conduct such hearings, in New Jersey, "[a] due
process hearing is an administrative hearing conducted by an
administrative law judge" in the Office of Administrative Law
("OAL").  N.J.A.C. 6A:14-2.7(a).  "If the local educational
agency has not resolved the complaint to the satisfaction of the
parents within 30 days of the receipt of the complaint, the due
process hearing may occur, and all of the applicable timelines
for a due process hearing under this subchapter shall commence"
20 U.S.C. § 1415(f)(1)(B)(ii); 34 C.F.R. § 300.510(b); see
N.J.A.C. 6A:14-2.7(j) ("A final decision shall be rendered by
the administrative law judge . . . after the conclusion of the
resolution period").

    Once the 30-day resolution period ends, federal regulations
require that due process petitions be decided by hearing
officers within 45 days, unless either party requests specific
adjournments.  34 C.F.R. § 300.515(a) (states receiving federal
funding "must ensure that not later than 45 days after the
expiration of the 30 day period under § 300.510(b) . . . (1) A
final decision is reached in the hearing; and (2) A copy of the

decision is mailed to each of the parties."). Consistent with the mandate of federal law, New Jersey's Administrative Code contains a similar requirement. N.J.A.C. 6A:14-2.7(j) ("[a] final decision shall be rendered by the administrative law judge not later than 45 calendar days after the conclusion of the resolution period[.]").

Both Federal and New Jersey State law permit "specific adjournments" to be granted "at the request of either party" which will effectively toll the 45-day period within which a decision must be entered. See N.J.A.C. 6A:14-2.7(j) (45-day period may only be extended if "specific adjournments are granted by the administrative law judge in response to requests by either party to the dispute"); 34 C.F.R. § 300.515(c) ("[a] hearing or reviewing officer may grant specific extensions of time beyond the periods set out in paragraphs (a) and (b) of this section at the request of either party."). No other delays are contemplated. Therefore, if no specific adjournments are requested by the parties, a final decision must be rendered within 45 days after the end of the 30-day resolution period. 34 C.F.R. § 300.515(a); N.J.A.C. 6A:14-2.7(j). The parties, and therefore the Court, refer to this requirement as the "45-day rule." With that overview, the Court turns to Plaintiffs' allegations.

II.  Plaintiffs' Motion for Summary Judgment

Rather than organizing their motion for summary judgment around the counts in the Second Amended Complaint, Plaintiffs structure their motion by the issues embedded in the two-count Complaint.  (ECF 243-1).  First, Plaintiffs ask that the Court hold that NJDOE violated the IDEA and have been doing so since 2005, essentially asking for a finding of liability as to Count I.  (Id. at 1-2).  Second, they also ask that the Court enjoin Defendants from further violating the IDEA and that the Court appoint a special master to oversee Defendants' remediation efforts.  (Id.)  Finally, they also ask the Court to declare that Defendants fraudulently concealed their violations of the IDEA and that the entire controversy doctrine would not bar certain subsequent individual actions.  (Id.)

III. Defendants' Motion for Summary Judgment

Defendants have organized their motion for summary judgment around the two counts in the Second Amended Complaint.  (E CF 247-1).  They argue that the Court should grant summary judgment in their favor on Count I because the record does not show a systematic violation of the IDEA and that Plaintiffs are not entitled to the relief they request under the IDEA.  (Id. at 1-5).  They further argue that summary judgment must be granted in their favor for Count II because the § 1983 claim is barred by the Eleventh Amendment, the Commissioner is not amenable to

suit, and that the Commissioner is not subject to liability under the IDEA.  (Id.)

### DISCUSSION

I.   Subject Matter Jurisdiction

Plaintiffs' claims arise under the IDEA and § 1983.  This Court, therefore, exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

II.   Standard of Review

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence;

13

instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  Scott v. Harris, 550 U.S. 372, 381 (2007).

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp., 477 U.S. at 330; Fed. R. Civ. P. 56(a).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

### III.   The Parties' Cross Motions for Summary Judgment under the IDEA

Both parties move here for summary judgment on Plaintiffs' claim that NJDOE violated the IDEA and whether the requested relief is available under the statute. (ECF 243, 247).  As outlined above, the IDEA and its attendant regulations require that a student with a disability be provided with a FAPE.  Key here is the requirement that a due process petition receive a final determination within 45 days of its transmittal from NJDOE to OAL, barring any specific adjournments requested by the parties.  See 34 C.F.R. § 300.515(a), (c).  After reviewing the submissions of the parties, the Court believes that the crux of its determination here rests on the genuineness, if any, of any issue of material fact.  It is certainly a close question in

that the Court discerns precious little in the record that militates against a finding in Plaintiffs' favor.  Ultimately, though, the Court holds that the factual questions embedded in this matter are best suited for resolution at trial.

> a. Count I, Violation of the IDEA

Both Plaintiffs and Defendants seek summary judgment on whether NJDOE violated the IDEA, specifically the 45-day rule. After a review of all of the submissions by the parties, it is clear to the Court that Defendants have not proffered sufficient evidence such that there is no genuine factual dispute that NJDOE has not systematically violated the 45-day rule.  The question is much closer with respect to Plaintiffs' motion.

There are several pieces of evidence that heavily support Plaintiffs' position.  First, and critically, the United States Department of Education ("USDOE") conducted an investigation on NJDOE's dispute resolution system and concluded on May 6, 2019 that "the State does not have procedures for ensuring that decisions in due process hearings are issued within the 45-day timeline or within allowable extensions[.]"[6] (ECF 243-4 at 32).

---

[6] The Court holds that this report by the USDOE is properly admissible under the hearsay exception for factual findings from a legally authorized investigation pursuant to Federal Rule of Evidence 803(8)(A)(iii).  Clark v. Clabaugh, 20 F.3d 1290, 1294 (3d Cir. 1994) ("We note further that Federal Rule of Evidence [808(8)(A)(iii)] explicitly excepts public records and reports 'resulting from an investigation made pursuant to authority granted by law,' from exclusion under the hearsay rule, because

This is weighty evidence of Defendants noncompliance with the 45-day rule given the thoroughness of the investigation and its close proximity in time.   (See id.)  Equally important to the Court's analysis as the report, is the fact that Defendants do not offer credible factual material to rebut its findings or to show that it has since addressed the concerns of the USDOE. Defendants proffer a broadcast memo that NJDOE sent to OAL, dated August 6, 2019, which states that "Under the Individuals with Disabilities Education Act (IDEA) and its implementing regulations, a final decision in a special education due process hearing must be issued and provided to the parties within 45-days after the expiration of the 30-day resolution period[,]" and that NJDOE would be collecting monthly data from OAL regarding adherence to that rule. (ECF 234-4 at 315).  However,

---

official reports contain inherent indicia of trustworthiness."); Dunn v. Premier Cap., Inc., 2013 WL 3466826, at *3 (D.N.J. July 9, 2013) ("The letters from the Department of Education and the New Jersey Higher Education Student Assistance Authority are admissible under the public records exception. As Dunn argues, officials at the two agencies wrote both letters after an investigation and in accordance with the guidelines of the U.S. Department of Education.")  There is nothing in the record to suggest that the report lacks trustworthiness.  Further, under Federal Rule of Evidence 403, the Court finds that the probative value of the report is not outweighed by the risk of unfair prejudice.  First, the report is probative of the very issue at the heart of this litigation, whether NJDOE complied with the 45-day rule.  Second, the risk of unfair prejudice, confusing the issues, or waste of resources is low given that the contents of the report are linked very closely to the actual factual investigation that USDOE conducted and that that investigation substantially overlaps with the issues now before the Court.

there is nothing in the record to show that there was an accurate tracking mechanism in place at NJDOE or OAL such that NJDOE had accurate information to analyze. Plaintiffs correctly point out that NJDOE has no mechanism to check whether the reasons for adjournments at OAL were made at the request of the parties, the only allowable ground for adjournments under the IDEA. (See 243-1 at 10-12). Indeed, NJDOE's 30(b)(6) witness only was able to point to "conversations" that NJDOE employees had with OAL regarding compliance subsequent to the USDOE's report but was not able to indicate any tracking mechanism put in place to ensure that the 45-day rule was being followed. (See ECF 243-4 at 64-68; NJDOE 30(b)(6) Tr. 99:10- 104:10).

Defendants try to rebut the contention that they have been violating the 45-day rule by pointing to the procedural history of each of the due process petitions of the named Plaintiffs. This does not help their case as the very facts that they point to show numerous delays not attributable to requests by the parties.

For A.S., Defendants contend that only 41 days passed from the time that the resolution period expired to the time that she signed her settlement agreement. (ECF 247-1 at 23). Yet Defendants very enumeration of the case timeline shows that the math does not add up. First, Defendants note that the due process petition was transmitted to OAL in June 2017 and that in

18

September the parties "consented" to hearing dates in the following November, January and March. (Id. at 24). There is nothing in the record to suggest that the parties requested hearing dates so far out, as the IDEA requires. Even if the Court were to ignore the fact that hearing dates were set well into the following year, by its own calculation, 54 days elapsed before the parties executed a settlement agreement in October 2017.

For D.O., Defendants appear not to count the day elapsed between the end of the resolution period and when NJDOE transmitted the petition to OAL for a hearing. (Id. at 25). As explained above, under the IDEA, any time after the end of the resolution period that is not tolled due to specific adjournments requested by the parties, is counted toward the 45-day timeline. Defendants completely ignore the passage of that day in their analysis. Further, Defendants note that in October 2015, the ALJ scheduled hearing dates for December 2015 and January 2016, starting two months in the future. (Id.) Defendants have not proffered any evidence that those hearing dates were selected under an adjournment request by either of the parties. In addition, the ALJ ultimately rendered their decision in September 2016, almost a year after the due process petition was initially transferred and more than 45 days after the end of the resolution period, based on the Court's

19

calculation.  (Id. at 25-26).  Defendants argue that "45 days after D.O.'s last submission in support of her motion, the Court issued a decision in the matter," (id. at 27) but that is not the standard.

For S.B.C., the record shows that in September 2017 the ALJ scheduled hearing dates set to begin in February 2018 and there is no evidence that the parties requested a specific adjournment until then.  (Id. at 30).  Even more fundamentally though, more than 45 days, excluding permissible adjournments, elapsed between the petition's transmittal to OAL on July 7, 2017 and its settlement on May 29, 2018.  (Id. at 31-32).  Defendants ostensibly try to skirt around this damning fact by pointing to delays caused by "extensive settlement negotiations" but do not confront the gaps in time that were not occasioned by adjournment requests by the parties.  (Id.)

The situation with C.P.'s due process petition was much the same.  Even starting from the point that briefing was concluded, in February 2018, it took the ALJ until December 2018 to render a decision.  (Id. at 28-29).  Defendants are able to explain that a selection of those days in that expanse of time were due to adjournment requests by the parties, but the vast majority of those 10 months appears to have been attributable to impermissible delays.

For M.S., Defendants' own account of the procedural history

20

shows the ALJ proposing hearing dates more than a month out from when they met with the parties to set a hearing date, points in time when months of delays went by without requested adjournments.  (Id. at 32-33).  Defendants also state that "Between March and September, the District and the M.S. family argued about discovery," (id. at 32) seemingly in an attempt to explain the delays in the handling of the due process petition. Just the same, they point to nothing in the record, and the Court does not discern anything on its independent review that leads it to believe that any of that time was tolled due to adjournment requests by the parties.

For Y.H.S., Defendants fail to explain why in January 2018, the ALJ scheduled the due process hearing to begin in July 2018, many months later.  (Id. at 33-34).  Further, while Defendants allude to adjournments requested by the parties during the pendency of the due process petition, they do not specify when those requests were made and for how long.  (Id.)

For E.M., Defendants contend that hearing dates were rescheduled "due solely to the parties' unavailability." (Id. at 35).  But that statement is belied by Defendants' own timeline. Defendants state that after previously setting down the hearing date for September 2016, "The parties then agreed to have the hearing on March 20, 2017, April 10 and 12, 2017, and May 1, and 9, 2017."  (Id.)  Defendants proffer nothing to suggest that

this delay was occasioned by specific adjournment requests by the parties.  In addition, Defendants are not able to point to any such adjournment to explain why NJDOE waited until July 13, 2016 to transmit E.M.'s petition to OAL, when the petition was initially filed on May 25, 2016.  Those days beyond the 30-day resolution period also counted against the 45-day timeline.

The delays in L.G.'s procedural history are eerily similar to those described in the cases above.  Defendants' own account of the record shows a 4-day delay between the end of the resolution period and transmittal, and then an adjournment of hearing dates of 3 and a half months that Defendants do not contend was the product of a specific adjournment request by the parties.  (Id. at 37).  Defendants lean heavily on the fact that L.G. ultimately withdrew her due process petition 6 months after it was originally filed, a point at which the 45-day timeline had elapsed multiple times over.  (Id.)  At the point of withdrawal, Defendants had already violated the IDEA.

With regard to Plaintiff M.M., Defendants seem to point to the filing of multiple due process petitions as the principal reason for the delay in the disposition of M.M.'s case. (Id. at 37-39).  However, they do not explain why the filing of subsequent petitions allowed for a delay in handing of the earlier petitions.  (Id.)  Setting that issue aside, the record shows that once all of the petitions were filed and

22

consolidated, the Court set a hearing date for M.M.'s petition 6 months later, not apparently at the request of the parties. (ECF 247-4 at 95).  Though Defendants contend that that scheduling decision was made with the "consent" of the parties they do not state that it was made at the "request" of a party, which is what is required by law.  Moreover, the record in this case is replete with instances in which ALJs who render the decisions propose, insist upon, and appear to even coerce hearing dates to fit their schedules and not the requirements of the IDEA.  "Consent" in this context is not the ordinary meaning of the word.

Finally, for E.P.'s due process petition, the record shows that in September 2016, the ALJ was proposing and scheduling hearing dates in February and April 2017.  (Id. at 39-40).  On top of many other inexcusable delays, after post hearing briefing was completed on July 12, 2017, the ALJ took another 48 days to render their final decision.  That time period alone swallows up the 45-day timeline for disposition of these petitions as required by the IDEA.

In sum, by Defendants' own account of events, it took longer than 45 days to resolve the petitions for each of the named Plaintiffs, and in many case much longer, all within the context of not so much as a nod to the IDEA.  They have not proffered any evidence to show that delays were attributable to

requests by the parties.  What's more, the record shows that NJDOE is still counting time using "federal days", after the USDOE issued its report and after NJDOE itself acknowledged that the standard under the law was simply calendar days in August 2019.  (See ECF 243-4 at 32 ("ALJs who serve as hearing officers use 'Federal days,' rather than calendar days in calculating the 45-day timeline. The State was unable to provide its definition of 'Federal day' or method for calculating the 45-day timeline, and acknowledged that it does not have a mechanism for ensuring that ALJs who serve as hearing officers are reaching hearing decisions and mailing a copy of the decision to the parties within the 45-day timeline."); Id. at 315 ("Under the Individuals with Disabilities Education Act (IDEA) and its implementing regulations, a final decision in a special education due process hearing must be issued and provided to the parties within 45-days after the expiration of the 30-day resolution period.")).  Even after USDOE directed NJDOE to stop using federal days and NJDOE acknowledged in its own broadcast memorandum that "days" was the correct metric to use under the IDEA, "federal days" was still used by NJDOE and OAL.

Indeed, the 30(b)(6) witness for OAL acknowledged the continued use of "federal days" in its dealings with due process petitions.  (See ECF 243-4 at 113, Tr. 62:6-25 (deposition of OAL's Rule 30(b)(6) witness) (acknowledging the use of "federal

days" on a current form)).  Chief ALJ, Ellen Bass, in the

portion of her testimony as a fact witness, even admitted that

"some of our cases take too long to be decided and in that

respect, we're not complying with the spirit [of the law]." (See

id. at 123, Tr. 102:14-16).  The fact that she caveats that

statement with her belief that "I firmly believe that we are

complying with the letter of the law," (id. at 123, Tr. 102:13-

14) does not take away the significance of her previous

statement.  She admits that cases are taking too long, and her

interpretation of the IDEA has no basis in that law or

elsewhere.  The law is clear that the IDEA only contemplates

petitions taking longer than the 45-day timeline where there

have been specific adjournment requests by either party.  34

C.F.R. § 300.515(c) ("[a] hearing or reviewing officer may grant

specific extensions of time beyond the periods set out in

paragraphs (a) and (b) of this section at the request of either

party.").

Chief ALJ Bass's internally contradictory statements show

factual tension in the record.  Whether to deny Plaintiffs'

motion is certainly a close call given the plethora of weighty

evidence in the record that militates toward a finding that

Defendants have violated the 45-day rule systematically and with

impunity.  For instance, there are examples in the record of

NJDOE and OAL flouting the 45-day rule after USDOE's report and

after NJDOE issued its memo to OAL regarding the fact that
"days" was the proper metric by which to judge the 45-day
timeline.  The record shows due process petition transmittal
forms from NJDOE to OAL 2020 and 2021 using the term "federal
days."  (ECF 234-5 at 278; 283).

It also shows the Chief ALJ rescheduling hearing dates in
2021 because of her own internal conflict, not because of a
request by the parties in the case.  (Id. at 287).  The record
also contains multiple opinions by ALJs on due process petitions
from 2020 and 2021 where the procedural history showed the
petitions taking longer than the 45-day timeline and not because
of specific adjournment requests by the parties.  (See id. at
291; ECF 234-4 at 319, 384).  All of these instances together
make a strong case for systematic violations of the IDEA by way
of the 45-day rule that not only date back for years but that
continue to this day.

This raises a temporal component to Plaintiffs' motion.
Plaintiffs ask the Court to grant summary judgment in their
favor on its contentions that these violations extended all the
way back to 2005.  Given that the farthest back that a named
plaintiff filed a due process complaint with NJDOE was 2015 (ECF
78 at 22), the Court finds it abundantly clear that Plaintiffs
certainly are not entitled to summary judgment in their favor
for the time period prior to 2015.  The Court, however,

26

considers evidence of violations of the IDEA back in 2005 as probative of whether there has been a violation from 2015 onward.  The analysis regarding whether NJDOE violated the IDEA for years now requires some stitching together of different pieces of evidence across the record.

First, in 2003, OAL received a letter regarding concerns that a group of special education practitioners had regarding violations of the 45-day rule and in 2004 NJDOE received a similar letter on timeline issues for special education cases.[7] (See ECF 88-2 at 13-15, 17).  Therefore, NJDOE was at least aware of this issue as early as 2004, if not sooner.  Indeed, ALJ Sanders, who was the Chief Judge prior to ALJ Bass, testified that she along with a representative from NJDOE attended a meeting on this issue in early 2005. (ECF 243-5 at 31-32, Sanders Tr. 40:13- 41:7).  Judge Sanders stated that out of that meeting, OAL tried to implement new regulations that would make sure that hearings were handled in a timely fashion and that actually happened. (Id. at 34, Tr. 50:18-23).  She further testified that prior to 2010 the new regulations put in place in 2005 "stopped moving cases[.]" (Id. at 45-46, Tr. 96-99).  These letters coupled with Judge Sanders' testimony

---

[7] The Court views these letters not to be hearsay as it considers it for effect on the listener, namely OAL and NJDOE. United States v. Edwards, 792 F.3d 355, 357 n.2 (3d Cir. 2015).

27

suggest that Defendants were aware of a problem in the dispute
resolution system at least as far back as 2005.  In addition,
when presented with statistics on how many cases were closed at
OAL between 2005 and 2008 within 45 days, NJDOE's 30(b)(6)
witness admitted that the data did not contain any information
on whether the timeline included legal adjournments, (ECF 243-4
at 82, Tr. 167:12-20) a piece of information critical to ensure
that Defendants were in compliance with the law during that
period.

Second, Judge Sanders admitted that the term "federal days"
was used all the way back in 2005 and that the meaning did not
change during her 14-year tenure as Chief Judge at OAL (id. at
40-41; Tr. 76:7- 77:4).  As explained above, "federal days" is
not the standard set forth for counting time under the 45-day
rule per the IDEA.  Therefore, the Court sees ample evidence
violations of the IDEA extend back as far as 2005, but will view
the evidence through the lens of whether it is probative of
violations from 2015 onward, the earliest point one of the named
plaintiffs filed a due process petition.

A. Whether Violations of the 45-Day Rule Amounted to
   a Denial of FAPE

It is important to note here that the inquiry does not end
with a conclusion whether Defendants did not comply with the 45-
day rule: the Court must find that such a failure amounted to a

denial of FAPE.  The Court has already touched on the standard
to determine whether there has been a denial of FAPE under the
IDEA in its Opinion on the motion to dismiss the Second Amended
Complaint.  The Court will reiterate the standard here to the
extent necessary to facilitate its analysis.  "[T]he Supreme
Court has directed that a school district's liability for
violations of the IDEA is a two-fold inquiry: (1) [h]as the
school district complied with the procedures set forth in IDEA?;
and (2) [h]as the school district fulfilled its obligation to
provide the student with a FAPE?" D.B. v. Gloucester Twp. Sch.
Dist., 489 F. App'x 564, 566 (3d Cir. 2012) (quoting C.H. v.
Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010)).  Not
every procedural violation of the IDEA constitutes denial of a
FAPE.  Thus, for Plaintiffs' to prevail on their motion, the
Court would have to hold that Defendants violated of the 45-day
rule from 2015 through present and that such violation amounted
to a denial of FAPE.

The Third Circuit has held that while "it is important that
a school district comply with the IDEA's procedural
requirements, rather than being a goal in itself, such
compliance primarily is significant because of the requirements'
impact on students' and parents' substantive rights." D.S. v.
Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010).  In
other words, "[a] procedural violation constitutes a denial of a

FAPE when that violation causes 'substantive harm' to the child or her parents." D.B., 489 F. App's at 566 (quoting C.H., 606 F.3d at 66); J.A. v. Monroe Twp. Bd. of Educ., No. 18-9580, 2019 WL 1760583, at *1 (D.N.J. Apr. 22, 2019) (citing G.N. v. Board of Educ. of Tp. of Livingston, 309 F. App'x 542, 546 (3d Cir. 2009)) (same).

This Court has previously held that "[v]iolations of procedural safeguards constitute a denial of FAPE if they have: (1) impeded the child's right to a FAPE; (2) significantly impeded a parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits." J.A., 2019 WL 1760583, at *1 (citing G.N., 309 F. App'x at 546).

"While a slight delay in the provision of a hearing after a request has been made or a slight delay in rendering a decision may be an excusable procedural infirmity in some cases, the failure to offer the parents and their children a timely hearing for months after the expiration of the 45-day period . . . crosses the line from process to substance." Blackman v. D.C., 382 F. Supp. 2d 3, 9 (D.D.C. 2005) ("Blackman II") (quoting Blackman v. D.C., 277 F. Supp. 2d 71, 80 (D.D.C. 2003) ("Blackman I")). "When a plaintiff's rights to the due process hearing are circumscribed in significant ways, a plaintiff need not show prejudice in order to demonstrate injury. It follows

30

that where [a school] has outright denied a child a timely due process hearing, [it] cannot claim that the denial of a free appropriate education has not occurred.  It has." Blackman I, 277 F. Supp. 2d at 80.

Several courts throughout the country have recognized that significant delays or the total failure to provide timely due process hearings itself may constitute irreparable harm. Blackman II, 382 F. Supp. 2d at 9; M.M. v. Paterson Bd. of Educ., 736 F. App'x 317, 322 (3d Cir. 2018) (quoting Blackman and acknowledging its reasoning).  Indeed, authority relied upon by Defendants recognizes as much.  E.M. v. Pajaro Valley Unified School District, 2006 WL 3507926, at *6 (N.D. Cal. Dec. 5, 2006) (recognizing that while minor delays in reaching decisions on due process petitions may not rise to denial of a FAPE, more significant delays might be actionable).

In Blackman, at the time the plaintiffs filed their motion for preliminary injunction with the federal district court, 121 days had passed after they first requested a due process hearing, without one being provided.  Blackman II, 382 F. Supp. 2d at 9.  It appears no party to that underlying due process hearing requested specific adjournments that could render such delays excusable.  Had the plaintiffs continued with the due process hearing on the timeframe offered to them, the earliest conceivable date a decision could have issued would have been

31

158 days after their initial request for a hearing.  Id.  The district court concluded that "[s]uch a delay unquestionably constitutes denial of [the child's] right to a [FAPE] and therefore [constitutes] irreparable harm."  Id.

Similarly, in Miller v. Monroe Sch. District, a United States District Court in the Western District of Washington found that a student was denied a FAPE where it was "142 days past the deadline for issuing a decision, nearly three times longer than the regulations contemplate" and "[d]uring this time, [the child's] education was in flux [and] [i]t was unclear whether the [d]istrict provided him an appropriate placement[.]" Miller v. Monroe Sch. Dist., 131 F. Supp. 3d 1107, 1113 (W.D. Wash. 2015).  The district court found that "[b]ecause of this, the [d]istrict denied [the student] a FAPE during the time from which the due process decision was due to the time it was actually issued."  Id.

In Department of Education v. T.G., a United States District Court for the District of Hawaii held that a school district must "convene a due process hearing[] and issue [an] administrative decision within the timelines established . . . violated [the student's] substantive rights."  Dep't of Educ. v. T.G., 2011 WL 816808, at *9 (D. Haw. Feb. 28, 2011).  The court explained that "where an educational agency has outright denied a student a timely due process hearing, the student has been

32

deprived of a FAPE and need not show prejudice in order to demonstrate injury." Id.

Essentially, these courts held that a significant delay in providing a due process hearing – one measured in months beyond expiration of the 45-day rule - constitutes a substantive as opposed to procedural harm, and therefore, constitutes denial of a FAPE.

As mentioned above, there is weighty evidence in the record that Defendants took much longer than 45 days to resolve due process petitions as a norm not just in exceptional or limited circumstance.  There is also much in the record that counsels toward a finding that these delays amounted to systemic violations of the 45-day rule and a violation of Plaintiffs' substantive rights and therefore a denial of FAPE as a matter of profound administrative disfunction.  As set forth above in its analysis of the timelines of the due process petitions of each of the named Plaintiffs, they each experienced delays more than just a few days, more often than not adding up to months and months of the languishing of their cases.  As in Blackman II, the plethora of delays here do not appear attributable to the request of the parties and very much seem to have prejudiced them.  382 F. Supp. 2d at 9 ("Such a delay unquestionably constitutes denial of S.J.'s right to a Free Appropriate Public Education ("FAPE") and therefore irreparable harm.").

33

Long delays often deprive parent-plaintiffs of the right to participate in the education of their disabled children.  When a procedural violation "significantly impede[s] the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child[,]" that violation denies families the substantive right of participation.  D.B., 489 F. App'x at 566 (quoting C.H., 606 F.3d at 67); see 20 U.S.C. § 1400(c)(5)(B) (parents and families of disabled children must "have meaningful opportunities to participate in the education of their children").  The record appears uncontroverted at least with respect to the sheer months of time that Plaintiffs' claims were not advanced at NJDOE and OAL.  That lost time in determining the suitable educational environment for the children subject of the petition, and in providing those services in a timely fashion, is not recuperable.

However, despite the apparent delays that Plaintiffs clearly suffered, the Court stops short of granting summary judgment in their favor at this time.  The testimony of Chief ALJ Bass presents enough of a genuine issue of material fact that proceeding to trial is appropriate.  Specifically, Chief ALJ Bass testified, "I firmly believe that we are complying with the letter of the law," (ECF 243-4 at 123, Tr. 102:13-14).  Though it is ultimately for the Court to decide whether

Defendants were complying with the "letter of the law", Chief ALJ Bass based that testimony on her years of experience with OAL, as outlined throughout her deposition.  (See, e.g., id. at 120, Tr. 89-92 (discussing OAL's efforts at transparency).  Given that her testimony was based on this experience, it would be hasty for the Court to grant summary judgment for Plaintiffs.

While there is no express provision for the in Fed. R. Civ. P. 56, this Court also believes that as the factfinder in this matter and, if Defendants are found liable, the person responsible for considering the scope and timing of equitable remedies, that the undersigned would benefit from the trial process in having a fuller understanding of the complicated issues of administrative law inherent in this case.  Witnesses will be cross-examined and the Court will have its own opportunity to ask questions over the course of trial.  The remedies Plaintiffs seek here are broad in scope and would if granted have significant ramifications for the State of New Jersey.  These proceedings began as an application for the extraordinary relief of a preliminary junction.  Any permanent injunction is a more significant exercise of this Court's considerable powers and should not be undertaken lightly but on the fullest and clearest record, one developed in the crucible of the adversarial process.

Defendants also urge the Court to deny Plaintiffs' motion for summary judgment based on the IDEA and to grant theirs on the separate ground that prospective injunctive relief is not available under the IDEA.  (ECF 247-1 at 21; ECF 320 at 27-28). The Court finds that contention meritless.  Where there is an ongoing violation of federal law and the relief is prospective, the Court may order it.  Delaware River Joint Toll Bridge Comm'n v. Sec'y Pennsylvania Dep't of Lab. & Indus., 985 F.3d 189, 193-94 (3d Cir. 2021), cert. denied sub nom. Berrier v. Delaware River Joint Toll Bridge Comm'n, 142 S. Ct. 109 (2021) (determining whether to grant the relief "requires us to 'conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law' and whether it 'seeks relief properly characterized as prospective.'") (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)).

Defendants' motion for summary judgment and their opposition to Plaintiffs' motion implicate the issue and so the Court will offer some words as to why the IDEA offers prospective injunctive relief.  Defendants principally argue that Plaintiffs are not entitled to the prospective injunctive relief that they seek because they have not shown an ongoing violation of law.  (ECF 247-1 at 53; ECF 320 at 27).  That is a question that goes to relief under § 1983, which the Court will

36

address later on.  More fundamental, though, is the question of whether the IDEA countenances injunctive relief of this kind.

In denying Defendants' motion, the Court holds that it does.  While the Third Circuit has offered guidance on the type of remedies available against a school district for violation of the IDEA, it has not addressed what kind of relief a court may impose against a statewide dispute resolution system for falling short of its obligations under the law.  See A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 803 (3d Cir. 2007) (analyzing the scope of the IDEA in the context of a suit against a school district).  Courts are clear that only remedy under the IDEA is for the Court to restore FAPE where it has been wrongfully denied.  Durbrow v. Cobb Cty. Sch. Dist., 887 F.3d 1182, 1190 (11th Cir. 2018) ("[T]he only remedy available under the IDEA is injunctive relief for the wrongful denial of a FAPE [.]"); S.D. by A.D. v. Haddon Heights Bd. of Educ., 722 F. App'x 119, 125 (3d Cir. 2018) (noting that the IDEA provides relief for the denial of FAPE).  Thus, the question is whether an injunction against NJDOE would be a remedy to restore FAPE.  The Court holds in the affirmative.

As explained above, the law is already clear that the significant impediment of a parent's opportunity to participate in a decision making process constitutes a denial of FAPE.  J.A., 2019 WL 1760583, at *1.  It only follows that, as

37

countless courts have done before, this Court could impose the
appropriate injunction to remedy the denial of FAPE.  Blackman I
and Blackman II, out of the District of D.C. are probably the
most instructive cases here.  In the Blackman cases, it was the
D.C. Public School System, itself, rather than some state agency
that was responsible for holding timely due process hearings.
See Blackman I, 277 F. Supp. 2d at 73-74.  The Court in the
Blackman cases entered injunctions against the D.C. Public
School System to restore FAPE to the children to whom it had
been denied.  See id. at 88-89 (ordering the D.C. Public School
System to "reschedule and conduct administrative due process
hearings requested by these plaintiffs[.]").  The Court would be
doing much the same as was done in the Blackman cases to fix
inherently flawed systems that deny children FAPE and avoid the
"perverse" outcomes occasioned by reading into the statute
nonsensical procedural technicalities.  Id. at 80; Blackman II,
382 F. Supp. 2d at 9 (noting that "[w]ith respect to the
Blackman plaintiffs, whose complaint centers on defendants'
failure to provide timely due process hearings, the IDEA does
not provide parents with any administrative mechanism to compel
DCPS to provide the hearing" and that therefore it is only
logical that the federal courts be empowered to address the
flawed administrative hearing system).  That there is more harm
that found in the Blackman cases does not render the remedy

inapplicable.  To the contrary, it emphasizes a greater need for
it.

Therefore, in the absence of precedent to the contrary and
considering the fact that this Court's issuance of an injunction
would be targeted at remedying the denial of FAPE, the Court
holds that it does have the power to issue the injunction that
Plaintiffs seek.  To the extent that Defendants argue that
Plaintiffs are not likely to be affected by NJDOE's dispute
resolution system again in the future, the Court disagrees and
finds that the situation Plaintiffs find themselves in is
capable of repetition yet evading review.  Hamilton v. Bromley,
862 F.3d 329, 335 (3d Cir. 2017) (holding that the doctrine
applies "where (1) the challenged action is in its duration too
short to be fully litigated prior to cessation or expiration,
and (2) there is a reasonable expectation that the same
complaining party will be subject to the same action again.");
Stop Reckless Econ. Instability Caused by Democrats v. Fed.
Election Comm'n, 814 F.3d 221, 230 (4th Cir. 2016)
("In class actions, at least when the class is certified while
the case remains live for the named plaintiff, a reasonable
expectation that someone in the represented class will be
subject to the same action may be sufficient to satisfy the
'capable of repetition' prong of the exception.").  The named
plaintiffs have specifically made clear that they are reasonably

likely to have to file due process petitions in the future and some have already filed multiple petitions.  Thus, the Court holds that it has the power to grant prospective injunctive relief under the IDEA.

Defendants first directly touch on this issue in their reply brief in further support of their motion, arguing that some of the named plaintiffs' claims are now moot and that those plaintiffs lack standing.   (ECF 324 at 2-6).  They argue that one of the children is 21 and another moved out of state such that the situations of those plaintiffs cannot fall under the mootness exception of capable of repetition yet evading review.[8] (Id.)  Courts typically do not address arguments raised for the first time in reply briefs.  In re Revstone Indus. LLC, 690 F. App'x 88, 90 (3d Cir. 2017) ("Furthermore, Ascalon's standing argument is articulated for the first time in its reply brief, and does not explain Ascalon's injury beyond the single sentence quoted above."); Owner-Operator Indep. Drivers Ass'n v. United States Dep't of Transportation, 878 F.3d 1099, 1102 n.4 (8th Cir. 2018), as corrected on denial of reh'g (Apr. 3, 2018) ("They also raised a new argument for the first time in their reply brief: procedural standing. We have held previously that standing should be established at the first appropriate point in

---

[8] They also argue that one is about to turn 20 (id.), but that still leaves the child well within the purview of the IDEA.

the review proceeding.") (internal alterations omitted).

Standing is jurisdictional, though, so the Court will consider

it.  Petroleos Mexicanos Refinacion v. M/T KING A (EX-TBILISI),

377 F.3d 329, 334 (3d Cir. 2004) ("Standing is a question of

subject matter jurisdiction.").

Critically, though, in making this argument, Defendants

completely miss the transitory exception to mootness.

Richardson v. Bledsoe, 829 F.3d 273, 279 (3d Cir. 2016)

("[C]ourts have often recognized that the relation back doctrine

applies to claims that are 'inherently transitory' or 'capable

of repetition yet evading review.').  For any named plaintiffs

who are unlikely to file another due process petitions,

Richardson, though squarely discussing tactics by defendants to

settle claims with named plaintiffs before class certification,

makes clear that where plaintiffs file for class certification

at a reasonable time or when the named plaintiff had a personal

stake in the outcome of the action at the time of the filing of

the complaint, the relation back doctrine will apply.  Id. at

287.  Here, Plaintiffs filed their first motion for class

certification in October 2019, only a few months after filing

the complaint and their claims were clearly live at the time of

the filing of their complaint.  (ECF 1, 30); Richardson, 829

F.3d at 289-90. ("Because Richardson's individual claims for

injunctive relief were live at the time he filed this complaint,

the subsequent mooting of these claims does not prevent Richardson from continuing to seek class certification or from serving as the class representative.") To hold otherwise could leave a situation where "no remedy could ever be provided for continuing abuses." Id. at 280.   Thus, the Court rejects Defendants' standing argument.[9]

The Court also finds it within its power to appoint a special master to assist in carrying out any order given the complexity of remedying NJDOE's dispute resolution system.   Apex Fountain Sales, Inc. v. Kleinfeld, 818 F.2d 1089, 1097 (3d Cir. 1987) (noting that appointment of a special master may be appropriate where "implementing the court's order would be a complex and lengthy process, probably involving monitoring,

---

[9] With respect to the argument that the 21-year-old is no longer covered by the IDEA, the Third Circuit has not squarely been faced with the issue whether the IDEA applies up until a child's 21st birthday or through the age of 21.   Ferren C. v. Sch. Dist. of Philadelphia, 612 F.3d 712, 718 (3d Cir. 2010) ("First, Despite the text of section 1412(a)(1)(A), which statutorily limits a school district's obligation to provide a FAPE only to students under the age of twenty-one, an individual over that age is still eligible for compensatory education for a school district's failure to provide a FAPE prior to the student turning twenty-one.").   The Second Circuit has held that the IDEA applies through the age of 21 rather than until the child's 21st birthday.   St. Johnsbury Acad. v. D.H., 240 F.3d 163, 168 (2d Cir. 2001) ("After reviewing supplementary briefs from the parties, we conclude that IDEA originally entitled D.H. to a FAPE until his 22nd birthday.") (emphasis in the original). With these statements in mind and based on the Court's plain reading of the IDEA, it is not convinced that the named plaintiff who is 21 years old does not have standing even without the relation back doctrine.

dispute resolution, and development of detailed enforcement mechanisms.") (internal quotation marks omitted); Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 874 (D.N.J. 2003), aff'd, 399 F.3d 248 (3d Cir. 2005) ("Finally, this Court concludes that due to the extensive nature of the cleanup and Honeywell's continued recalcitrance in effectuating an appropriate cleanup, that the appointment of a Special Master pursuant to Rule 53(b) of the Fed.R.Civ.P. is appropriate.")

Defendants argue in their motion that summary judgment should be granted in their favor because the Court does not have the power to appoint a special master in that oversight of the dispute resolution system has already been delegated to the U.S. Secretary of Education. (ECF 247-1 at 21; ECF 320 at 34). Defendants do not cite a single case to that effect.  They only cite § 1416 of the IDEA for this proposition which lists oversight responsibilities of the Secretary.[10]  Subsection 1416(f) discusses enforcement of the IDEA by state authorities, clearly showing that the Secretary is not the only individual or institution who can enforce the IDEA.

In fact, at least one other Court has held that because the only mechanism that the Secretary has to correct a dispute

---

[10] It is not lost on the Court that Defendants make this argument after ostensibly refusing for over two years to remedy defects that the USDOE found with its dispute resolution system.

resolution system is withholding federal funds, the Secretary
cannot be the only individual empowered to enforce the IDEA. St.
Louis Developmental Disabilities Treatment Ctr. Parents Ass'n v.
Mallory, 591 F. Supp. 1416, 1439 (W.D. Mo. 1984), aff'd sub
nom. St. Louis Developmental Disabilities Treatment Ctr.
Parents' Ass'n v. Mallory, 767 F.2d 518 (8th Cir. 1985) ("This
Court does not believe that Congress created this role for
parents and guardians while intending to withhold from them the
ability to challenge a portion of their state's system that if
left uncorrected would deprive their child of an appropriate
education.")  Thus, the Court believes the appointment of a
special master is appropriate in this case if Defendants' are
found liable.

  B. Whether Defendants Fraudulently Concealed Their
     Violation of the 45-Day Rule

     The Court must deny Plaintiffs' request for a declaration
that NJDOE "has wrongfully concealed its systemic violation of
the 45 Day Rule through the use of the fraudulent 'federal
days[]'" (ECF 243-1 at 36) for the simple reason that Plaintiffs
did not plead that relief in their Second Amended Complaint.
Since the request for that declaration is not in the operative
complaint, the Court cannot grant summary judgment on it.  Miami
Tribe v. United States, 2008 WL 4172244, at *1 (D. Kan. Sept. 5,
2008) ("As the equitable relief sought in the motion for summary

judgment has not been previously pled in the Complaint and significantly expands the scope of the relief sought, the Court cannot grant any of the relief sought[.]"); Redland Co., Inc. v. United States, 97 Fed.Cl. 736, 756 (2011) (declining to consider a claim for relief not contained in the plaintiff's complaint and first raised in plaintiff's motion for summary judgment); Lima v. United States Dep't of Educ., No. CV 15-00242 KSC, 2017 WL 2369368, at *5 (D. Haw. May 31, 2017) ("Requests for relief that are presented in a summary judgment motion are not causes of action in the litigation without having been pled in the Complaint.")

Even if this request for relief were plead in the Second Amended Complaint, the Court would have to deny the motion for summary judgment on this point as there appears to be a genuine issue of material fact. The evidence in the record is such that "a reasonable jury could return a verdict in the nonmoving party's favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For example, there are statements in the record by NJDOE's 30(b)(6) witness that NJDOE believed that it was in compliance with the 45-day rule and the IDEA. (See 234-4 at 74, NJDOE 30(b)(6) Tr. at 134:1-20). Thus, there would be a question for the factfinder at trial as to whether Defendants fraudulently concealed their violation of the IDEA.

C. Whether the Entire Controversy Doctrine Bars
   Certain Future Actions

Plaintiffs also ask the Court to declare:

Whether New Jersey's "entire controversy" doctrine would not preclude the commencement of subsequent individual actions against NJDOE, seeking substantive equitable relief not sought on behalf of class members in this action, such as (i) compensatory education, (ii) reimbursement of tuition or the cost of specific services, or (iii) reimbursement of attorneys' fees, where the right to those remedies have been waived against the Local Educational Agency (LEA) as a result of NJDOE's broken dispute resolution system.

(ECF 243-1 at 31).

Critically, Plaintiffs are asking for a declaration about future actions.  That kind of declaration would be an advisory opinion and one not permissible for this Court to give.  Hightower v. United States, 2010 WL 174836, at *2 (D.N.J. Jan. 13, 2010) ("While we understand plaintiffs' concerns about any future litigation. . . [t]he Court may not give legal advice, rule on hypothetical future events, or issue advisory opinions."); Transamerica Life Ins. Co. v. Daibes Gas Holdings Atlanta, L.L.C., 2018 WL 5033755, at *5 (D.N.J. Oct. 17, 2018) (same).

Even if the Court were to opine on whether the entire controversy doctrine would apply to future actions, this Court's declaration would not bind the future Court in determining if the entire controversy doctrine applied.  In re Skelaxin (Metaxalone) Antitrust Litig., 299 F.R.D. 555, 578 (E.D. Tenn.

2014) (noting "no court can determine the preclusive effect of its judgment in a separate, subsequent action"); <u>Aris Gloves, Inc. v. United States</u>, 420 F.2d 1386, 1393 (Ct. Cl. 1970) ("All that really needs to be said about the Gray case is that the opinion by the court was strictly an advisory opinion which was not binding upon either of the parties and cannot be binding upon subsequent courts."). Therefore, the Court will also deny the portion of the motion requesting a declaration on the impact of the entire controversy doctrine on claims that may be raised before some other Court in the future.

    b. <u>Count II, Violation of § 1983 by the Commissioner.</u>

In Plaintiffs' motion for summary judgment they do not clearly move on Count II as to whether the Commissioner violated § 1983. Indeed, the relief that they seek in the motion only pertains to NJDOE's violations of the IDEA. Therefore, as meritorious as a motion by Plaintiffs for summary judgment as to Count II might be, the Court will not address the issue from that lens. However, Defendants did move for summary judgment as to Count II and the Court will address the claim against the Commissioner in that context. Because Defendants have failed to proffer evidence sufficient to meet their burden, their motion will be denied. Specifically, they argue that Plaintiffs' § 1983 claim (1) is barred by the Eleventh Amendment, (2) that the Commissioner is not a person amenable to suit under § 1983, and

(3) that the Plaintiffs cannot pursue a § 1983 claim in seeking relief for their IDEA claims.  These are all legal questions which the Court addressed in its Opinion on Defendants' motion to dismiss the Second Amended Complaint.  However, they bear some more analysis here.

The Court will consider Defendants' argument that relief under § 1983 is not available to Plaintiffs for violations of the IDEA.  Defendants are correct that A.W, 486 F.3d at 803, stands for the proposition that a plaintiff cannot use § 1983 as a substitute for their IDEA claims.  However, their argument misses two key nuances to that rule.  First, § 1416(*l*) states:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C.A. § 1415(*l*)

Subsection (*l*) specifically left open the avenue for plaintiffs to sue based on other substantive laws if the relief sought was distinct from what is available under the IDEA.  A.W, 486 F.3d at 798 ("By preserving rights and remedies "under the Constitution," section 1415 [(*l*)] does permit plaintiffs to resort to section 1983 for *constitutional* violations,

48

notwithstanding the similarity of such claims to those stated directly under IDEA.") (emphasis in original).  In Count II, on § 1983, even though Plaintiffs mention provisions of the IDEA as background for their claim, they cite to the Fourteenth Amendment as the basis of their § 1983 claim.  (ECF 78 at 82) ("Pursuant to the due process clause of the Fourteenth Amendment, Plaintiffs are entitled to the opportunity to be heard at a meaningful time and in a meaningful manner."). Courts have held that there is a property interest in education and that therefore, prior to the deprivation of such interest, a plaintiff must be provided with a meaningful opportunity to be heard prior to the deprivation in order to comport with the Fourteenth Amendment.  Hamilton v. Radnor Twp., 502 F. Supp. 3d 978, 990 (E.D. Pa. 2020) ("The Fourteenth Amendment creates a guarantee of fair procedure whereby an individual can assert that she was deprived of a life, liberty, or property interest without due process of law.") (internal quotation marks omitted);  Garcia v. Capistrano Unified Sch. Dist., 2018 WL 6017009, at *12 (C.D. Cal. Mar. 30, 2018) ("Further, a plaintiff can bring a Section 1983 action alleging the deprivation of procedural due process in state special education administrative proceedings.");  K.A. ex rel. J.A. v. Abington Heights Sch. Dist., 28 F. Supp. 3d 356, 367 (M.D. Pa. 2014) (noting property interest in public education);  Abernathy v. Indiana Univ. of

Pennsylvania, 2013 WL 3200519, at *1 (W.D. Pa. June 18, 2013) (noting the need for a meaningful opportunity to be heard before the deprivation of education); Dommel Properties, LLC v. Jonestown Bank & Tr. Co., 2013 WL 1149265, at *9 (M.D. Pa. Mar. 19, 2013) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner."). Thus, maintaining a separate claim under the Fourteenth Amendment and vindicated via § 1983 is completely in accordance with § 1415(*l*).[11]

Second, § 1983 may be used to enforce rights that have already been vindicated under IDEA. L.J. ex rel. V.J. v. Audubon Bd. of Educ., 2009 WL 995458, at *3 (D.N.J. Apr. 13, 2009), aff'd, 373 F. App'x 294 (3d Cir. 2010) (stating that the Third Circuit's reliance on Sellers by Sellers v. School Bd. of

---

[11] The use of § 1983 to vindicate Plaintiffs Fourteenth Amendment rights makes sense here as the Third Circuit's law has previously been unclear as to whether a problem in a due process hearing after the administrative complaint has been filed is even cognizable under the IDEA. C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 73 n.13 (3d Cir. 2010) ("As a matter of chronology, a state administrative complaint could not seek relief for a due process violation that had not yet occurred. Thus, any claim for deprivation of procedural due process in the state administrative proceedings cannot be redressed by the remedial provisions of the IDEA; the aggrieved party must file a separate § 1983 action in the District Court, supported by appropriate factual allegations."). To be clear, and as explained above, the Court holds today that the IDEA does allow Plaintiffs to seek the relief they ask for in Count I. The Court merely notes that there is ample room in the caselaw for Plaintiffs to bring additional claims based on violations of the Fourteenth Amendment.

City of Manassas, Va., 141 F.3d 524 (4th Cir.1998) in A.W. makes clear "that a section 1983 enforcement action lies against a school board which failed to abide by a final administrative order"); C.K. v. Tredyffrin/Easttown Sch. Dist., 2010 WL 9583434, at *2 (E.D. Pa. Mar. 30, 2010) (allowing the claim to proceed where "the plaintiffs [sought] to have a favorable IDEA decision enforced under § 1983").  Thus, Defendants' argument on Count II lacks merit because if Defendants fail to address IDEA violations as set forth in this Court's Opinion, the law is very clear that Plaintiffs would have a separate § 1983 action against them even if it did not find a violation now.[12]

---

[12] Separately, the Court notes that the All Writs Act, 28 U.S.C.A. § 1651, has been used as a mechanism by courts to remedy unreasonable agency delay, and the Act seems to underscore the appropriateness of the Court having an avenue to remedy NJDOE's flagrant delays. In re Pub. Emps. for Env't Resp., 957 F.3d 267, 273 (D.C. Cir. 2020)(utilizing the All Writs Act to remedy "unreasonable agency delay."); Susquehanna Valley All. v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 236-37 (3d Cir. 1980) (noting the potential application of the All Writs Act to a situation where there is malfeasance by an agency but the statutory scheme surround the agency's actions leaves "a large gap in the protection available to the public"); Frutiger v. Hamilton Cent. Sch. Dist., 928 F.2d 68, 73 (2d Cir. 1991) ("Finally, it does remain within our discretion to treat defendants' appeal as a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a), seeking immediate issuance of an order to the district court to conduct the requested evidentiary hearing concerning Amy's 1990-91 placement."); see also W S Int'l, LLC v. M. Simon Zook, Co., 566 F. App'x 192, 195 (3d Cir. 2014) ("We may construe a notice of appeal as a petition for writ of mandamus, but that decision is discretionary.")  Thus, were relief not available directly under the IDEA, the Court would construe Plaintiffs as seeking a writ of mandamus to remedy NJDOE's dispute resolution system.

Count II also is not barred by the Eleventh Amendment as Defendants argue because Plaintiffs seek prospective relief against the Commissioner in her official capacity for an ongoing violation of law. Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 179 (3d Cir. 2002) ("The principle which emerges from *Young* and its progeny is that a state official sued in his official capacity for prospective injunctive relief is a person within section 1983, and the Eleventh Amendment does not bar such a suit.") Thus, Defendants are not entitled to prevail on those arguments either.[13] Though Plaintiffs did not move for summary judgment on Count II, the record and the law would strongly support a ruling in their favor. As the procedural posture of the case currently stands, the Court will deny Defendants' motion for summary judgment as to Count II.

## CONCLUSION

For the reasons expressed in this Opinion, both parties' motions for summary judgment (ECF 243, 247) will be denied. Plaintiffs' motion for sanctions (ECF 301) will also be denied.

An appropriate Order will be entered.

Date: September 1, 2022          s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.

---

[13] Defendants' argument that the Commissioner is not a necessary party to this action is belied by the fact that Plaintiffs are specifically seeking relief from the Commissioner in the form of implementing corrective measures should the Court hold that NJDOE has been violating the Fourteenth Amendment.